**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>           Defendants. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>           Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>           Plaintiff,<br>v.<br><br>HSBC Bank PLC, *et al.*<br><br>           Defendants. | Adv. Pro. No. 09-1364 (BRL)<br><br><br>11-CV-06677 (JSR) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**ALPHA PRIME FUND LIMITED AND SENATOR FUND SPC'S**
<u>**MOTION TO WITHDRAW THE REFERENCE**</u>

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND .................................................................................................................... 5

ARGUMENT .......................................................................................................................... 8

I.      ALPHA PRIME AND SENATOR'S MOTION CANNOT MEET THE
        REQUIREMENTS FOR MANDATORY WITHDRAWAL ........................................... 8

        A.      Section 157(d) Has Been Narrowly Construed in the Second Circuit ................... 9

        B.      The Trustee Has Standing to Assert Bankruptcy Causes of Action ................... 12

        C.      The Bankruptcy Court's Interpretation Of Bankruptcy Code Section
                548(c) Does Not Warrant Mandatory Withdrawal ............................................. 13

        D.      Interpretation of Section 546(e) of the Bankruptcy Code Does Not
                Warrant Mandatory Withdrawal ...................................................................... 13

        E.      Alpha Prime and Senator Submitted to the Jurisdiction of the Bankruptcy
                Court by Filing a Proof of Claim ...................................................................... 17

CONCLUSION ..................................................................................................................... 19

# TABLE OF AUTHORITIES

Page

**Cases**

*Bankr. Servs. Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432 (2d Cir. 2008). .................................................................................................................... 18

*Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709 (S.D.N.Y. 1986) ............................................................................................................. 10

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) ................................................ 10

*Degirolomo v. Track World, Inc.* (*In re Laurel Valley Oil Co.*), No. 07-6109, 2009 WL 1758741 (Bankr. N.D. Ohio June 16, 2009) ....................................... 17

*Enron Corp. v. J.P. Morgan Sec.,* (*In re Enron Corp.*) 388 B.R. 131 (S.D.N.Y. 2008) .............. 10

*Enron N. Am. Corp. v. Random House Inc. (In re Enron Corp.)*, No. 03 Civ. 9312 (LTS), 2007 WL 102085 (S.D.N.Y. Jan. 12, 2007) .................................................... 16

*First Fid. Bank N.A., N.J. v. Hooker Invs. Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833 (2d Cir. 1991) .................................................................................................. 18

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63 (S.D.N.Y. 2006) ............................................................................................. 10

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680 (S.D.N.Y. 1995) .............................................................................................. 10, 11

*In re Bally Total Fitness of Greater N.Y.*, 411 B.R. 142 (S.D.N.Y. 2009) ................................... 18

*In re Bernard L. Madoff Inv. Sec. LLC,*  2011 WL 4434632 (Bankr. S.D.N.Y. Sept. 22, 2011) . 15

*In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) ........................... 6, 7, 11, 12

*In re Housecraft Indus. USA, Inc.,* 310 F.3d 64 (2d Cir. 2002) ................................................... 12

*In re Johns-Manville*, 63 B.R. 600 (S.D.N.Y. 1986) .................................................................... 11

*Int'l Ass'n of Machinists and Aerospace Workers v. E. Air Lines, Inc.* (*In re Ionosphere Clubs, Inc.*), 103 B.R. 416 (S.D.N.Y. 1989) ........................................ 11

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001) ........ 9

*Keene Corp. v. Williams Bailey & Weisner, L.L.P. (In re Keene Corp.),* 182 B.R. 379 (S.D.N.Y. 1995) ................................................................................................ 11

*Keller v. Blinder (In re Blinder Robinson & Co., Inc.)*, 135 B.R. 892 (D. Col. 1991) ................. 17

## TABLE OF AUTHORITIES
### (Continued)

Page

*Langenkamp v. Culp*, 498 U.S. 42 (1990) ........................................................................ 18

*Picard v. HSBC Bank PLC,* 454 B.R. 25 (S.D.N.Y. 2011). ............................................. 2

*Picard v. Katz,* No. 11 CV 3605, 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011) ....................... 14

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010), *leave to appeal denied*, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011).................. 15, 17

*Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005)................ 8

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010) .............................................................. 5, 6, 7

*Shugrue v. Airline Pilots Ass'n, Int'l* (*In re Ionosphere Clubs, Inc.*), 922 F.2d 984 (2d Cir. 1990). ........................................................................................................................ 9, 10

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295 (Bankr. S.D.N.Y. 2011)..................... 17

*SIPC v. S.J. Salmon*, No. 72 Civ. 560, 1973 U. S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973) . 9

*Stern v. Marshall*, 131 S.Ct. 2594 (June 23, 2011)............................................................. 16, 18

*Walker, Truesdel, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended Stay, Inc.)*, 2011 WL 5532258 (S.D.N.Y. November 10, 2011)......................................... 16, 18

**Statutes**

11 U.S.C. § 502(d) ............................................................................................................. 6

15 U.S.C. § 78aaa ............................................................................................................. 1

15 U.S.C. § 78eee-(b)(4) .................................................................................................. 4

15 U.S.C. § 78fff(b) ......................................................................................................... 6

15 U.S.C. § 78fff-1 ........................................................................................................... 7

15 U.S.C. § 78fff-1(a) ....................................................................................................... 7, 12

15 U.S.C. § 78fff-2(c) ....................................................................................................... 5

15 U.S.C. § 78fff-2(c)(3) ................................................................................................... 7, 8

28 U.S.C. § 157(a). ........................................................................................................... 9

28 U.S.C. § 157(d) ............................................................................................................ 9, 10, 12, 17

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), by and through his undersigned counsel, hereby submits this memorandum of law in opposition to Alpha Prime Fund Limited and Senator Fund SPC's Motion to Withdraw the Reference and supporting Memorandum of Law (the "Mem. of Law") filed in *Picard v. HSBC Bank PLC*, *et al.,* Adv. Pro. No. 09-1364 (Bankr. S.D.N.Y.) (BRL)[2], No. 11-CV-06677 (S.D.N.Y.) (JSR) (ECF No. 1).

## PRELIMINARY STATEMENT

Alpha Prime Fund Limited ("Alpha Prime") and Senator Fund SPC ("Senator") are seeking to invoke this Court's jurisdiction in a renewed effort to deprive the bankruptcy court of its central role of ensuring the ratable distribution of customer property to all customers—who have filed over 16,000 customer claims—in the largest SIPA liquidation in history.  With the floodgates fully flung open, more and more parties, including those present here, are blatantly engaging in forum shopping by seeking to bypass the bankruptcy court—which previously ruled on the issues raised here—and withdraw actions involving quintessentially "core" bankruptcy causes of action that Congress intended the bankruptcy courts to hear and determine in the first instance.

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. §§ 78aaa *et seq*. For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] A copy of the complaint (cited as "Compl.") filed by the Trustee against Alpha Prime and Senator, among other parties, including HSBC Bank PLC, is annexed to the Declaration of Oren J. Warshavsky, Esq. ("Warshavsky Decl.") as Exhibit 1.

Alpha Prime and Senator, akin to the movants in over 50 other motions to withdraw the reference involving more than 350 actions now pending before this Court, has seized upon certain narrow rulings by this Court, and seeks to convert section 157(d) into an "escape hatch" out of the bankruptcy court.  What's more, this Motion comes months after this Court granted the initial Motion to Withdraw the Reference to the Bankruptcy Court filed in this action, to address (and later dismiss) common law claims asserted by the Trustee, and referred all of the bankruptcy-related causes of action back to the bankruptcy court.[3]  In addition, Alpha Prime and Senator had already filed their Answer, Affirmative Defenses, and Cross-Claim in the bankruptcy court.[4]

Through this procedural gamesmanship, Alpha Prime and Senator—along with the defendants in the other 350 plus actions presently before this Court—are eviscerating the bankruptcy court's nearly three years of hard work and perverting section 157(d).  Indeed, this is precisely the type of conduct against which courts in the Second Circuit have warned.  This should not be permitted in the face of clear Second Circuit precedent narrowly construing section 157(d) and giving deference to bankruptcy courts to address purely core matters.  Simply put, none of the issues raised in the Motion require *substantial and material consideration* of non-bankruptcy federal law.

Alpha Prime and Senator are not innocent bystanders to Madoff's Ponzi scheme.  Alpha Prime and Senator are both highly sophisticated feeder funds, that knowingly funneled investors' money into the Madoff Ponzi Scheme, in an effort to reap unprecedented profits and unearned management fees.  Alpha Prime and Senator, despite their obligation to perform due diligence

---

[3] *See Picard v. HSBC Bank PLC,* 454 B.R. 25, 38 (S.D.N.Y. 2011).

[4] *See Picard v. HSBC Bank PLC,* Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y., May 27, 2011) (ECF No. 82).

and safeguard their clients' investments, overlooked glaring red flags and indicia of fraud during their affiliation with BLMIS.[5]  For example, Madoff claimed that his options transactions took place on the Chicago Board Options Exchange (the "CBOE").  Yet, more than one third of the time, the purported options trading in Alpha Prime's BLMIS account ("Alpha Prime's Account") and Senator's BLMIS account ("Senator's Account") exceeded the *total* worldwide reported volume of comparable options contracts traded on the CBOE.[6]  *See* Compl. at 56-57.  There were *one hundred and fifty three* impossible options transactions in Alpha Prime's Account and a plethora of impossible options transactions in Senator's Account as well.  Even a single "impossible" options trade should have caused Alpha Prime and Senator to investigate further. *See id.* at 56-57.  Both Alpha Prime and Senator also ignored the inordinately high percentage of purported options transactions in their accounts that did not comply with standard trading practices, settling in a time frame outside of industry norms.  *See id.* ¶¶ 221-22.   But Alpha Prime and Senator never once made any inquiries as to any of the abnormalities.

Alpha Prime and Senator were aware of other aberrations as well.  For example, on 34 separate occasions, spanning a total of 112 days, Alpha Prime's Account had a negative cash balance.  *See id.* at 65.  Senator's Account went into the red on four separate occasions, spanning a total of 14 days.  *See id.* at 66.  Neither Alpha Prime nor Senator had the benefit of a margin agreement or an interest charge.  No legitimate financial institution could have or would have

---

[5] Although the complaint makes reference to Alpha Prime and Alpha Prime Asset Management Ltd. together, all relevant red flag data derives from Alpha Prime's BLMIS account (No. 1FR097).   Similarly, although the complaint makes reference to Senator, Regulus Asset Management Limited, and Carruba Asset Management Limited, all relevant red flag data derives from Senator's BLMIS account (No. 1FR128).

[6] The volume of options contracts which BLMIS reported to Alpha Prime exceed the total volume of contracts for options traded on the CBOE by more than thirty-four percent.   The volume of options contracts which BLMIS reported to Senator exceeded the total volume of contracts for options traded on the CBOE by more than thirty-seven percent.  *See* Compl. at 56-57.

advanced the amount of money necessary to cover these negative balances without either of these mechanisms in place.  In addition, BLMIS forfeited literally millions of dollars of interest on these loans.  *See id. ¶¶* 174-75.  This unusual fee structure did not go unnoticed by other investment professionals, and was at the very least aberrational when compared to the fees charged by most investment funds.  *See id.* at 79.  Yet, in keeping with their *modus operandi*, Alpha Prime and Senator did not ask questions.  *See id. ¶* 176.

In short, Alpha Prime and Senator are unhappy with the bankruptcy court's prior decisions in this SIPA proceeding, *inter alia*, determining that section 546(e) of title 11 of the United States Code (the "Bankruptcy Code") does not apply in this case—or is at least a question of fact for defendants like these.  The bankruptcy court, however, is the proper forum for litigating questions of bankruptcy law and claims against the Debtors in this SIPA proceeding.[7] And it is the bankruptcy court that should determine, in the first instance, whether the safe harbor under Bankruptcy Code section 546(e) applies in this case or the appropriate standard to be applied under Bankruptcy Code section 548(c)—fundamental questions of bankruptcy law that require nothing more than construction and application of the Bankruptcy Code.  Despite the bankruptcy court's prior determination of these very same issues, Alpha Prime and Senator are seeking to transfer their case to this Court, which they perceive to be a more favorable forum, in the hopes of getting a better outcome than in the bankruptcy court.  The Trustee submits that such outright forum shopping should not be countenanced.

---

[7] Here, the Trustee seeks to avoid and recover fraudulent transfers that Alpha Prime and Senator, among the other named Defendants, received from BLMIS preceding the commencement of the SIPA proceeding.  SIPA § 78fff-2(c)(3) expressly incorporates the Bankruptcy Code and specifies that a SIPA proceeding is to "be conducted in accordance with, and as though it were being conducted under" the Bankruptcy Code and governed by relevant provisions of Title 11. Moreover, SIPA § 78eee-(b)(4) specifically requires that "[u]pon the issuance of a protective decree and appointment of a trustee … the court *shall* forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under title 11." SIPA § 78eee-(b)(4).

Simply put, no important undetermined issues of non-bankruptcy law exist here to necessitate withdrawal of the reference.  Accordingly, the Motion should be denied.

**BACKGROUND**

**A.      Commencement of the SIPA Liquidation**

Having adjudicated various Madoff liquidation matters, this Court's familiarity with the background of this matter is presumed.

**B.      The Customer Claims**

On December 23, 2008, the bankruptcy court entered a claims procedure order specifying the procedures for filing, determining, and adjudicating customer claims.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 126 (Bankr. S.D.N.Y. 2010) (the "Net Equity Decision").  The order provides that under section 78fff-2(a)(2) of SIPA, claims are filed with the Trustee, who determines the claims in writing. *Id.*  Claimants who oppose the Trustee's determination may file objections in the bankruptcy court for judicial resolution.  *Id.*

The Trustee has determined more than 16,000 customer claims.  The Trustee allowed or denied each claim depending on (1) whether the claimant was a customer of BLMIS (*i.e.*, had an account in his/her name), and (2) whether the claimant had positive "net equity," as defined by SIPA § 78fff-2(c), pursuant to the "net investment method."  This method assesses a customer's actual net deposits in the scheme, calculating the total amount deposited by the customer into his BLMIS account, and subtracting any amounts withdrawn from his account (the "Net Investment Method").  Certain claimants objected to the Net Investment Method arguing that net equity should be calculated instead based upon the fictitious amounts shown on the November 30, 2008 customer statements issued by BLMIS—the "last statement method." Judge Lifland rejected the "last statement method," holding that the Trustee's Net Investment Method was the only method

5

consistent with the plain language of SIPA, bankruptcy law, judicial case law regarding Ponzi schemes, and principles of equity.  *See Net Equity Decision*, 424 B.R. at 135.  The Second Circuit affirmed the Net Equity Decision, holding that the Trustee's Net Investment Method "is appropriate because it relies solely on unmanipulated withdrawals and deposits and refuses to permit Madoff to arbitrarily decide who wins and who loses." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 (2d Cir. 2011) (the "Second Circuit Net Equity Decision") (quoting *Net Equity Decision*, 424 B.R. at 140).

To date, the Trustee has allowed 2,419 claims of customers with positive net equity ("net losers") totaling $7.3 billion, and has paid or committed to pay approximately $798 million in funds advanced to him by SIPC.  Two hundred and forty-eight potentially allowable claims were "deemed determined," meaning that the Trustee instituted litigation against those customers. The complaints filed by the Trustee in those litigations set forth the express grounds for the disallowance of customer claims under section 502(d) of the Bankruptcy Code and/or equitable subordination.  Accordingly, the 248 claims will not be allowed until the avoidance actions are resolved by settlement or otherwise and any judgments rendered against the claimants in the avoidance actions are satisfied.  Until such time, the value of customer claims to be asserted against the customer fund remains unknown and may rise as high as approximately $17.3 billion.

## C.    SIPA Authorizes the Trustee to Pursue Avoidance Actions

SIPA § 78fff(b) grants the Trustee authority to conduct a SIPA liquidation proceeding "in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." SIPA § 78fff(b); *Second Circuit Net Equity Decision*, 654 F.3d at 231 ("Pursuant to SIPA, Mr. Picard has the general powers of a bankruptcy trustee, as well as additional duties, specified by the Act, related to recovering and distributing

customer property.") (citing SIPA § 78fff-1).   A SIPA trustee is given the powers of a bankruptcy trustee that enable him to perform the special functions of a SIPA liquidator.  *See* SIPA § 78fff-1(a).  In addition, SIPA § 78fff-2(c)(3) expressly incorporates the Bankruptcy Code and authorizes a SIPA Trustee to recover any fraudulent transfers, including those to customers. SIPA § 78fff-2(c)(3); *Second Circuit Net Equity Decision*, 654 F.3d at 241 n. 10 ("SIPA and the Code intersect to . . . grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers.") (quoting *Net Equity Decision*, 424 B.R. at 136).

**D.    Alpha Prime's and Senator's Customer Claims**

Alpha Prime and Senator filed customer claims, which are being litigated in this action.[8] One direct customer claim was filed by Alpha Prime for one BLMIS account, and fifty-three indirect claims were filed by third party investors in Alpha Prime.[9]   One direct customer claim was filed by Senator for one BLMIS account, and twenty indirect claims were filed by third party investors in Senator.[10] All of these issues remain in this action.

**E.    The Trustee's Avoidance Litigation Against Alpha Prime and Senator**

The Trustee's action against Alpha Prime and Senator involves a total of sixty-one individuals, feeder funds, and financial institutions that facilitated and furthered Madoff's fraud (collectively known as the "HSBC Action").   The complaint alleges ten bankruptcy-related causes of action against both Alpha Prime and Senator, seeking to avoid intentional and/or

---

[8] On or about February 2, 2009, Alpha Prime filed a customer claim with the Trustee for Account No. 1FR097, which the Trustee has designated as claim no. 001503.  On or about February 2, 2009, Senator filed a customer claim with the Trustee for Account No. 1FR128, which the Trustee has designated as claim no. 001504. Copies of the relevant customer claims are annexed as Exhibit 2 to the Warshavsky Decl.

[9] *Id.*

[10] *Id.*

constructive fraudulent transfers, as well as preferential transfers, of customer property from BLMIS to Alpha Prime and Senator, and to disallow and/or subordinate Alpha Prime's and Senator's customer claims, all as provided for in the Bankruptcy Code. *See* Warshavsky Decl. Ex. 1.  Specifically, the Trustee seeks to avoid from Alpha Prime, transfers of $85.8 million, and from Senator, transfers of $95.4 million, the entirety of which are avoidable and recoverable as fraudulent and preferential transfers of customer property under the Bankruptcy Code.

## ARGUMENT

### I.     ALPHA PRIME AND SENATOR'S MOTION CANNOT MEET THE REQUIREMENTS FOR MANDATORY WITHDRAWAL

Alpha Prime and Senator contend that this Court must withdraw the reference of the HSBC Action pursuant to section 157(d), but does not and cannot demonstrate any of the exceptional circumstances required for mandatory withdrawal.   Rather, the HSBC Action requires nothing more than adjudication of avoidance actions under the Bankruptcy Code to recover customer property.  In pursuing these bankruptcy claims against Alpha Prime and Senator, the Trustee is not violating SIPA.  Rather, SIPA expressly authorizes the Trustee to avoid transfers that are void and voidable pursuant to Title 11.  There is no exception in SIPA that precludes avoidance of transfers to customers; to the contrary, the recovery of transfers "to or on behalf of customers" is expressly contemplated in SIPA § 78fff-2(c)(3).

The Second Circuit recently confirmed that a SIPA trustee is conferred with "the ability to pursue fraudulent transfer actions on behalf of customers." *Second Circuit Net Equity Decision,* 2011 WL 3568936, at *1 and *12 n. 10. In fact, courts uniformly have held that a trustee may sue customers for fraudulent transfers.  *See, e.g., Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505, 512-13 (Bankr. S.D.N.Y. 2005) (holding that the trustee had standing to bring fraudulent transfer claims against customers); *Jackson v. Mishkin (In re Adler, Coleman*

*Clearing Corp.)*, 263 B.R. 406, 496 (S.D.N.Y. 2001) (affirming bankruptcy court's judgment that fraudulent transfers to customers were avoidable); *see also SIPC v. S.J. Salmon*, No. 72 Civ. 560, 1973 U. S. Dist. LEXIS 15606, at *31 (S.D.N.Y. Aug. 8, 1973) ("SIPA was not intended to make the fraudulent transfer provisions of the Bankruptcy Act inoperative as to stockbroker-debtors in SIPA proceedings.").  In fact, the Trustee is pursuing his avoidance claims so that the salutary purposes of the statute may be affected.  *See Second Circuit Net Equity Decision*, 2011 WL 3568936, at n. 10 (Second Circuit noting that "in the context of this Ponzi scheme – the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, *see* 11 U.S.C. § 548(a)(1)(A), and 'avoid[s] placing some claims unfairly ahead of others,' *In re Adler, Coleman Clearing Corp*., 263 B.R. 406, 463 (Bankr. S.D.N.Y. 2001).").  None of these issues, however, require withdrawal of the reference as there is no conflict between Title 11 and other federal non-bankruptcy laws.  They merely require the application of such laws.

### A.    Section 157(d) Has Been Narrowly Construed in the Second Circuit

The scope of bankruptcy jurisdiction over all matters affecting a debtor and its property is broadly construed.  *Shugrue v. Airline Pilots Ass'n, Int'l* (*In re Ionosphere Clubs, Inc.*), 922 F.2d 984, 994 (2d Cir. 1990).  All cases and proceedings arising under, arising in, or related to a bankruptcy case, including SIPA liquidations, are automatically referred to the bankruptcy court. *See* 28 U.S.C. § 157(a).[11]  For the bankruptcy court to proceed efficiently and within the bounds of its broad grant of jurisdiction, the reference to the bankruptcy court may be withdrawn only in

---

[11] Section 157(a) authorizes the District Court to refer any or all bankruptcy cases or proceedings arising under the Bankruptcy Code, or arising in or related to a case arising under the Bankruptcy Code to the bankruptcy court.  28 U.S.C. § 157(a).  By the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.), this Court referred all such matters in the Southern District of New York to the bankruptcy court.

limited circumstances, as provided in section 157(d) of Title 28.  *In re Ionosphere*, 922 F.2d. at

993.  Courts in the Second Circuit have consistently held that section 157(d) must be "construed

narrowly," *see, e.g., Ionosphere*, 922 F.2d at 995, and is not to be used as an "escape hatch

through which most bankruptcy matters [could] be removed to a district court."  *Gredd v. Bear,*

*Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 66 (S.D.N.Y. 2006) (quoting

*Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709, 711 (S.D.N.Y.

1986)) (alteration in original; internal quotation omitted).[12]  A narrow reading of the mandatory

withdrawal provisions is necessary so as not to "eviscerate much of the work of the bankruptcy

courts."  *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.),* 185 B.R. 680, 683

(S.D.N.Y. 1995).

Consistent with the narrow construction of section 157(d), the bar for mandatory

withdrawal of the reference is high.  Mandatory withdrawal "is not available merely because

non-Bankruptcy Code federal statutes will be considered in the bankruptcy court proceeding."  *In*

*re Ionosphere Clubs, Inc.*, 922 F.2d at 995.  Rather, as the Second Circuit has held, mandatory

withdrawal "is reserved for cases where *substantial and material consideration* of non-

Bankruptcy Code federal statutes is necessary for the resolution of the proceeding."  *Id.* at 995

(citation omitted) (emphasis added).   "Substantial and material consideration" requires a

bankruptcy judge to "engage in significant interpretation, as opposed to simple application, of

federal laws apart from the bankruptcy statutes."  *City of New York v. Exxon Corp.,* 932 F.2d

1020, 1026 (2d Cir. 1991); *In re Enron Corp.,* 388 B.R. at 136.  Indeed, the "substantial and

material consideration" standard excludes from mandatory withdrawal those cases that involve

---

[12] *See also Enron Corp. v. J.P. Morgan Sec. (In re Enron Corp.)*, 388 B.R. 131, 136 (S.D.N.Y. 2008) ("[t]he Second Circuit . . . construes this provision [157(d)] 'narrowly'. . . .") (citing *In re Ionosphere*, 922 F.2d at 995); *Keene Corp. v. Williams Bailey & Weisner, L.L.P. (In re Keene Corp.)*, 182 B.R. 379, 382 (S.D.N.Y. 1995) ("Mandatory withdrawal . . . is narrowly applied.").

only the routine application of non-Title 11 federal statutes to a particular set of facts.  *See In re Johns-Manville*, 63 B.R. 600, 602 (S.D.N.Y. 1986).

This stringent standard can be "more easily satisfied when complicated issues of first impression are implicated under non-bankruptcy federal laws." *In re Keene Corp.*, 182 B.R. at 382; *see also Houbigant*, 185 B.R. at 684 (withdrawing the reference "when complicated interpretive issues, often of first impression, have been raised under non-Title 11 federal laws"); *Int'l Ass'n of Machinists and Aerospace Workers v. E. Air Lines, Inc.* (*In re Ionosphere Clubs, Inc.*), 103 B.R. 416, 419-420 (S.D.N.Y. 1989).  Complexity alone, however, does not require withdrawal of the reference.  Bankruptcy courts ably decide complicated issues every day, and Judge Lifland has already done so in this liquidation proceeding.

Alpha Prime and Senator cannot meet the foregoing high standards for withdrawal of the reference to resolve the Trustee's fraudulent conveyance and preferential transfer claims because no material interpretation of non-bankruptcy federal statutes is required to resolve the issues at hand, nor is there any potential conflict between the Bankruptcy Code and other non-bankruptcy federal statutes.  Alpha Prime and Senator concoct a "conflict" between SIPA and the Bankruptcy Code, arguing that SIPA is a "non-bankruptcy statute" requiring "substantial and material" consideration by the bankruptcy court.  This is contrary to the express provisions of SIPA and well-settled bankruptcy law.  On its face, SIPA mandates removal to the bankruptcy court in the first instance.  SIPA is routinely interpreted by bankruptcy courts, as it was originally derived from a bankruptcy statute and specifically incorporates the Bankruptcy Code.  Further, pursuant to section 78fff-1, SIPA provides the Trustee with standing to pursue avoidance actions and recover customer property.  *See Second Circuit Net Equity Decision*, 654 F.3d at 241, n. 10 (finding that SIPA grants a trustee the power to avoid fraudulent transfers for the benefit of

customers).  Alpha Prime and Senator's allegation that SIPA cannot be analyzed and applied by the bankruptcy court is simply wrong.  The questions Alpha Prime and Senator ask this Court to determine are essentially factual ones concerning the allowance of a claim in this proceeding—which is a fundamental bankruptcy court function that does not implicate any federal non-bankruptcy law.  Alpha Prime and Senator cannot meet the narrow standard of section 157(d).

> **B.**     **The Trustee Has Standing to Assert Bankruptcy Causes of Action**

All of the claims at issue in this case are either brought under bankruptcy law or seek to impose a remedy to avoid and recover certain transfers of customer property which must be returned to the Trustee pursuant to SIPA and established bankruptcy law.  Therefore, there is no need to look beyond SIPA and bankruptcy law for the Trustee's standing to bring each of the claims asserted by the Trustee in this proceeding.

In its Net Equity decision, the Second Circuit recognized that SIPA grants the Trustee the power to avoid fraudulent transfers for the benefit of customers.  *See Second Circuit Net Equity Decision*, 654 F.3d at 241 n. 10.  The Second Circuit emphasized that a SIPA liquidation is "a hybrid proceeding" and a SIPA trustee "shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11." *Id.* citing 15 U.S.C. § 78fff-1(a).  *See also In re Housecraft Indus. USA, Inc.,* 310 F.3d 64, 71 (2d Cir. 2002) (stating bankruptcy trustee may avoid fraudulent transactions).  The Second Circuit further stated, "SIPA and the [Bankruptcy] Code intersect to . . . grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers." *Id.* quoting *Net Equity Decision,* 424 B.R. at 136.  It is then indisputable that the Trustee has standing to bring avoidance actions pursuant to SIPA and bankruptcy law.

C.    **The Bankruptcy Court's Interpretation Of Bankruptcy Code Section 548(c)
Does Not Warrant Mandatory Withdrawal**

Attempting to exempt themselves from the fraudulent conveyance laws and their

obligation to demonstrate good faith to retain the fraudulent transfers they received from Madoff,

Alpha Prime and Senator claim that the Court must withdraw the reference because of the

Trustee's allegedly "novel" interpretation of SIPA to impose retroactively a due diligence

obligation on brokerage customers.  Mem. of Law at 11.

Again, Alpha Prime and Senator's attempt to manufacture a conflict between the

Bankruptcy Code and SIPA wholly misses the mark.  First, Alpha Prime and Senator are not

typical innocent BLMIS customers, but highly sophisticated feeder funds for which investors

relied upon heavily to do the due diligence that they themselves could not do.  Second, any due

diligence obligation that Alpha Prime and Senator had upon becoming aware of facts that

imputed inquiry notice of Madoff's fraud has nothing at all to do with any interpretation of SIPA

or other non-bankruptcy federal law.  Rather, Alpha Prime's and Senator's due diligence (or, in

this case, lack thereof) is relevant only in the context of whether Alpha Prime and Senator can

establish a good faith defense to the Trustee's avoidance claims under section 548(c) of the

Bankruptcy Code and analogous state fraudulent conveyance laws.  Such an analysis requires

nothing more than a straight-forward application of the Bankruptcy Code itself, as well as

established case law interpreting the good faith defense under the Bankruptcy Code.

D.    **Interpretation of Section 546(e) of the Bankruptcy Code Does Not Warrant
Mandatory Withdrawal**

Alpha Prime and Senator also assert that the Court should withdraw the reference because

the Trustee and SIPC are interpreting Bankruptcy Code section 546(e) in a manner that conflicts

with SIPA.  Mem. of Law at 9-11.  However, withdrawal of the reference is not appropriate as to

this issue because its resolution involves only straightforward application and interpretation of

13

Bankruptcy Code provisions.  This issue presents no interpretive or complicated issues of first impression under non-Title 11 federal laws.  Alpha Prime and Senator attempt to argue that Bankruptcy Code section 546(e) prevents the Trustee from avoiding any fraudulent transfers made to them prior to December 11, 2006.  *Id*.  However, this Court has previously distinguished between innocent investors and those who are accused with knowledge that BLMIS was not engaged in legitimate trading activity:

> THE COURT: [I]f the person knows from the beginning that this is a Ponzi scheme and there are no real securities contracts, that the safe harbor is not available there, and that while it may be true that the defendants may contest that they knew it was a Ponzi scheme, that's a factual matter to be developed in the bankruptcy court rather than a matter that involves the legal complications of bankruptcy law versus securities law that led to my withdrawal of the reference in Katz …
>
> What you are saying is it's not really a meeting of the mind so much, what you are really saying is if both sides are aware this is not a securities contract, then 546(e) doesn't apply.
>
> MR. BELL:  Exactly, your Honor.
>
> THE COURT:  OK ... Well, I understand the argument. I think it has considerable force….

*Picard v. Avellino, et al,* No. 11 Civ. 03882 (S.D.N.Y., Oct. 18, 2011) (JSR) (Transcript of Oral Argument at 12-13).[13] *See also Picard v. Katz,* No. 11 CV 3605, 2011 WL 4448638 at *1 n.3 (S.D.N.Y. Sept. 27, 2011) (noting that section 546(e) was designed to protect investors—"except for any who were actual participants in the fraud.").

   As set forth above, Alpha Prime and Senator are not innocent bystanders to Madoff's Ponzi scheme.  Alpha Prime and Senator knowingly funneled investors' money into the Madoff Ponzi Scheme to reap unparalleled profits.  Alpha Prime and Senator, highly sophisticated feeder

---

[13] A copy of the Transcript of Oral Argument for the *Picard v. Avellino* matter is annexed as Exhibit 3 to the Warshavsky Decl.

funds, cannot credibly maintain that they were unaware of the:  (i) unfeasible options volume trading in their BLMIS accounts (*see* Compl. at 56-57); (ii) settling of trades in their BLMIS accounts outside industry norms that did not comply with standard trading practices (*see id.* ¶¶ 221-22); and (iii) unauthorized margin trading in their BLMIS accounts (*see id.* at 65-66).  There are other indicia of fraud noted in the complaint, but these alone show that Alpha Prime and Senator overlooked glaring red flags during its affiliation with BLMIS—any one of which is sufficient to demonstrate that Alpha Prime and Senator cannot assert that there is not, at the very least, a factual issue as to whether they could have reasonably believed that BLMIS was engaged in legitimate trading activity.

Clearly then, this is nothing more than a transparent attempt to "escape" the bankruptcy court's prior decisions holding that, *inter alia*, section 546(e) is inapplicable in the context of a Ponzi scheme—especially when applied to bad-faith actors that knowingly participated in the fraud such as Alpha Prime and Senator, who should not be granted the "safe harbor" of section 546(e).  *See e.g., Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010), *leave to appeal denied*, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011)[14]; *In re Bernard L. Madoff Inv. Sec. LLC,* 2011 WL 4434632, at *16 (Bankr. S.D.N.Y. Sept. 22, 2011) (holding that "the application of section 546(e) must be rejected as contrary to the purpose of the safe harbor provision").  However, the Southern District of New York has asserted that "avoiding an unfavorable decision is a not a proper basis for withdrawal of the reference."

---

[14] Further, when reviewing a motion for leave to appeal, District Judge Kimba M. Wood consistently approved of Judge Lifland's interpretation of the Bankruptcy Code in his denial of a motion to dismiss the Trustee's action to avoid and to recover alleged fraudulent transfers BLMIS made to investors managed by Ezra Merkin. *Merkin*, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011).

*Michigan State Hous. Dev. Auth. v. Lehman Brothers, et al*., No. 11-CV-3392 (JGK) (S.D.N.Y.,

Sept. 14, 2011) (Transcript of Oral Argument at 65).[15]

        More importantly, in a recent case in this judicial District, the Court did not find that the

application of a defense under section 546(e) warranted mandatory withdrawal of the reference.

*Walker, Truesdel, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended*

*Stay, Inc.)*, 2011 WL 5532258, at *7 (S.D.N.Y. November 10, 2011).  In particular, the *In re*

*Extended Stay* Court noted that whether section 546(e) of the Bankruptcy Code precluded certain

claims under the Fair Debt Collections Practices Act or certain securities laws, could not

overcome "the 'narrow' scope this Circuit gives to mandatory withdrawal under section 157(d)"

because the movants failed to point to any federal statute requiring "significant interpretation"

rather than mere application to a particular set of facts.  *Id.* (citations omitted) (denying

---

[15] The Honorable John G. Koeltl recently denied a motion to withdraw the reference finding that the bankruptcy court should be permitted, in the first instance, to determine the applicability of one of the "safe harbor" provisions under the Bankruptcy Code. *Michigan State Hous. Dev. Auth. v. Lehman Brothers, et al*., No. 11-CV-3392 (S.D.N.Y., Sept. 14, 2011) (JGK) (noting that issues surrounding the safe harbor were "plainly" core matters and there was no basis for withdrawing the reference because the case at hand, unlike the Supreme Court's *Stern v. Marshall* decision, was based entirely on bankruptcy law rather than state law). Judge Koeltl further noted:

> [T]he bankruptcy court has well-recognized expertise in interpreting the Code that would be useful to this court in analyzing *ipso facto* and safe harbor provisions at issue in Lehman's counterclaims. [The motion to withdraw the reference] suggests that these issues should be taken away from the bankruptcy court before it has even had an opportunity to render a decision. This would deprive this court and the Court of Appeals of the expertise of the bankruptcy court on the application of the Code's provisions to these particular transactions. This outcome would not advance judicial economy or the uniform administration of the Code. *See Enron N. Am. Corp. v. Random House Inc. (In re Enron Corp.)*, No. 03 Civ. 9312 (LTS), 2007 WL 102085 at *3 (S.D.N.Y. Jan. 12, 2007) ("It would not serve the interests of efficient administration of the bankruptcy system for this court to preempt prematurely or unnecessarily" the bankruptcy court's ability to interpret the Code).

*Id.* at 63.  A copy of Judge Koeltl's ruling as reflected in the Transcript of Oral Argument is annexed to the Warshavsky Decl. as Exhibit 4.

mandatory withdrawal of actions where the complaints were dominated by fraudulent transfer and preference claims notwithstanding the implication of section 546(e) and securities laws).

Finally, this Court has noted that the "securities laws" must be considered in connection with the application of section 546(e). Alpha Prime and Senator state the same. However, neither Alpha Prime nor Senator—nor any other defendant—has ever pointed to a single securities law at issue. Bankruptcy Code section 546(e) *explicitly refers* to definitions in the Bankruptcy Code itself. Simply put there is no additional law that needs to be interpreted outside of the Bankruptcy Code, nor have Alpha Prime and Senator cited to any.

As such, the determination of whether and how Bankruptcy Code section 546(e) should be applied requires only simple interpretation and application of the Bankruptcy Code. Accordingly, mere application of Title 11 is not a basis for mandatory withdrawal of the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d).[16]

### E.    Alpha Prime and Senator Submitted to the Jurisdiction of the Bankruptcy Court by Filing a Proof of Claim

That prior to being sued by the Trustee, Alpha Prime and Senator filed customer claims[17] in the BLMIS liquidation proceeding,[18] reinforces the conclusion that the bankruptcy court is the appropriate court for the adjudication of the actions against them. The Supreme Court, as well as

---

[16] In addition, section 546(e) is an affirmative defense to claims brought by a trustee, and the burden of proof rests on the Defendants. *Merkin*, 440 B.R. at 267; *see also Degirolomo v. Track World, Inc.* (*In re Laurel Valley Oil Co.*), No. 07-6109, 2009 WL 1758741, at *2-3 (Bankr. N.D. Ohio June 16, 2009). Unless its application is clearly established on the face of the complaint, it "does not tend to controvert [the trustee's] prima facie case." *Merkin*, 440 B.R. at 267. The Defendants cannot establish its application as a matter of law.

[17] *See supra* note 8.

[18] The filing of a customer claim in a SIPA action is the equivalent of filing a proof of claim in a typical bankruptcy proceeding for purposes of submission to jurisdiction. *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011) (citing *Keller v. Blinder (In re Blinder Robinson & Co., Inc.)*, 135 B.R. 892, 896–97 (D. Col. 1991)).

the Court of Appeals for the Second Circuit, has made clear that the bankruptcy court is the proper forum to adjudicate a proof of claim and matters directly related to that claim that are integral to the "restructuring of the debtor-creditor relationship."   *See Stern v. Marshall*, 131 S.Ct. 2594, 2616 (2011); *see also Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (per curiam) ("[B]y filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power"); *In re Bally Total Fitness of Greater N.Y.*, 411 B.R. 142, 145 (S.D.N.Y. 2009) (finding that "plaintiffs waived their ability to seek withdrawal of the reference when they filed a proof of claim and two motions before the Bankruptcy Court.") (quoting *Bankr. Servs. Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 466-67 (2d Cir. 2008) ("[f]iling a proof of claim against a bankruptcy estate triggers the process of allowance and disallowance of claims, and, therefore, a creditor who files such a claim subjects itself to the bankruptcy court's equitable jurisdiction in proceedings affecting that claim"); *see also In re Extended Stay*, 2011 WL 5532258 at *6 (finding that withdrawal of the reference of causes of action against defendants that would likely be "resolved in the process of ruling on [their] proof[s] of claim… would be contrary to the language of *Stern*, which categorizes itself as a "narrow" decision that does not "meaningfully change[ ] the division of labor" between bankruptcy courts and district courts.") (citations omitted).

By filing a claim in the BLMIS liquidation proceeding, Alpha Prime and Senator have submitted to the bankruptcy court's equitable jurisdiction for the adjudication of matters related to their claims, and cannot now argue that the bankruptcy court should not have jurisdiction over matters related to such claims.  *See*, *e.g.*, *First Fid. Bank N.A., N.J. v. Hooker Invs. Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833, 838 (2d Cir. 1991) ("[A] creditor who invokes the bankruptcy

court's equitable jurisdiction to establish a claim against a debtor's estate is also subject to the procedures of equity in the determination of preference actions brought on behalf of the estate."). This is a straightforward avoidance action; all relevant counts in the complaint are typical fraudulent conveyance and preferential transfer actions derived from the Bankruptcy Code and state law.  As such, Alpha Prime's and Senator's filing of a proof of claim brings their claims and matters related to resolving such claims clearly within the jurisdiction of the bankruptcy court.  The bankruptcy court is well-suited to handle these sorts of claims and routinely does so.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests the court deny the Motion.

Date:   New York, New York
        December 7, 2011

/s/ Oren J. Warshavsky
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*